UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GONZALO GUISBERT**,<br><br>        Plaintiff,<br><br>    v.<br><br>**WASHINGTON CONVENTION AND SPORTS AUTHORITY**, *trading as* EVENTS DC<br><br>        Defendant. | Civil Action No. 19-cv-2838 (TSC) |

**MEMORANDUM OPINION**

Plaintiff Gonzalo Guisbert filed this action in 2019 against his former employer, Defendant Washington Convention and Sports Authority ("Events DC"), after he was terminated for allegedly sleeping on the job. He alleges numerous age discrimination claims under federal and D.C. law. Events DC has moved for summary judgment, ECF No. 29. For the reasons explained below, this court will **DENY** the motion.

**I.    BACKGROUND**

**A. Factual Background**

Events DC is an independent authority of the District of Columbia government responsible for managing and operating the District's convention center. D.C. Code § 10-1202.02. Guisbert—a White Hispanic man in his 60s—began working for Events DC in July 1983 as a building engineer responsible for maintaining and repairing HVAC equipment in the convention center. Events DC's Stmt. of Facts not in Dispute ¶ 2, ECF No. 29-2 ("SOF"). In the decades that he worked for Events DC, Guisbert's role shifted to standing post and monitoring building systems in the convention center's Engineering and Fire Command Center.

*Id.* ¶ 3.  At all relevant times, he reported to Francis Tarpley and Eric Sidberry, Facilities Supervisors.  *Id.* ¶ 4.  Tarpley and Sidberry reported to Najib Mohammed, Maintenance Department Manager, who reported to Hootan Kaboli, Director of Facilities Operations and Services.  *Id.*  In February 2017, the Facilities Operations team was realigned, and Guisbert was reclassified from "building engineer" to "HVAC mechanic."  *Id.* ¶¶ 7-8.  Guisbert maintained the same job level, seniority, tenure, salary, and duties, but declined an invitation to apply for the new building engineer position, which had been moved to a higher job level with higher pay.  *Id.* ¶¶ 9-10.

On July 19, 2017, Mohammed sent all Events DC facilities employees a memorandum informing them that sleeping on the job would be grounds for disciplinary action, including possible termination.  *Id.* Ex. 7, July 19, 2017 Memo.  The memo stated that "anyone witnessed sleeping, napping, closing their eyes for extended lengths of time, etc., would be met with swift and progressive disciplinary action," including possible termination.  *Id.*

Events DC claims that disciplinary action would only be taken if a "member of leadership directly observed an employee" sleeping.  SOF ¶ 12.  In support, they point to an October 1 email from Kaboli declining to discipline a different employee because "the discovering party is not a member of leadership or management that has identified themselves for a statement," *Id.*, Ex. 8, Oct. 1, 2018 Kaboli Email, and Kaboli's deposition, in which he stated, "we don't evaluate members sleeping that weren't found by members of management."  *Id.*,, Ex. 5, Kaboli Dep. 97:21-98:13 ("Kaboli Dep.").  There is no evidence in the record indicating that Events DC published or disseminated this policy.  *Id.*  Guisbert claims that no such policy existed.  Pl.'s Stmt. of Disputed Facts at 1, ECF No. 31-2 ("Pl.'s Stmt.").

      i.        Discrimination Claims

Around 3:30 AM on August 30, 2018, Events DC's Assistant Director of Development Cathy Boles went to the command center to ask Guisbert—who was on duty at the time—to open a gate so she could leave the building. SOF ¶ 15. The parties disagree about what happened next. Events DC claims that Boles observed Guisbert "sleeping with a blanket covering his body and his feet propped up on a desk." *Id.* Guisbert claims that he was not sleeping and was simply startled when Boles entered the room from behind him. Pl.'s Stmt., Ex. 1, Guisbert Aff. ¶ 7. Guisbert also notes that a warning signal sounds in the control room every ten minutes which would have prevented him from falling asleep. *Id.* ¶ 8.

Boles orally reported this incident to Kaboli, who asked her to memorialize her observation in writing. *Id.* 80:21-22. On September 5, 2018, Boles prepared a one-paragraph memorandum to Kaboli, stating that she had "encountered Mr. Gonzalo Guisbert, HVAC Mechanic, seemingly asleep with a blanket covering his body and with his feet propped on the desk while on duty." SOF, Ex. 11, Boles Memo. The next day, Kaboli sent Monica Bullock, Events DC's Deputy Director of Human Resources, a memo describing the incident. SOF Ex. 2, Sept. 6 Kaboli Memo. In the memo, Kaboli stated that Guisbert was not on an authorized break at the time and recommended that he be terminated. *Id.* ¶ 17.

On September 11, 2018, Kaboli, Bullock, Guisbert, and a union steward met to discuss the incident. *Id.* ¶ 19. The parties again disagree about what happened next. Events DC contends that Guisbert did not deny having been asleep, and in fact seemed more focused on the question of whether he had a blanket with him. *Id.* ¶ 19; Kaboli Dep. 93:4-94:18; Ex. 13, Sept. 11, 2018 Bullock Handwritten Notes. Guisbert contends that he effectively denied the allegation by stating that he would file a grievance against Events DC and that he "would not resign because [he] didn't do anything wrong." Pl.'s Stmt., Ex. 1, Guisbert Aff. ¶ 9. It is undisputed

that Guisbert was offered the "choice" of resignation rather than termination, which he refused. SOF ¶ 19. Later that day, Guisbert was terminated via formal letter based on "[m]anagement's observation of you sleeping under a blanket with your feet propped on top [of] the desk . . . in the Engineering Command Center." Pl.'s Stmt., Ex. 4, Termination Letter.

On October 1, 2018, an Events DC Facilities Supervisor, Francis Tarpley, sent Kaboli a picture of HVAC mechanic Malcom Whittaker appearing to be asleep at the console of the command center. SOF, Ex. 8, Oct. 1, 2018 Tarpley Email ("Tarpley Email"); *see also* Pl.'s Stmt., Ex. 9 (photograph referenced in Tarpley Email). In response, Kaboli said the picture was "concerning" and merited "follow up . . . in some form." Tarpley Email. Kaboli went on to state that there are "[a] lot of unknown facts with just a picture," noting that the origin of the picture was unknown, and it was unclear if the "discovering party is . . . a member of leadership or management." *Id.* Kaboli promised, at minimum, an "intensive investigation." *Id.*

The next day, Kaboli met with Whittaker to discuss the photo. SOF ¶ 23. Whittaker stated that—based on his clothes and appearance—the photo was several years old, and that he may have been on break at the time. *Id.* Kaboli indicated that Whittaker was given a written warning, though Whitaker stated that he only received a verbal reprimand. *Compare* Kaboli Dep. 70:7-11 ("A memo to file can serve as a discipline in the future, if needed. . . .") *with* Pl.'s Stmt., Ex. 10, Whittaker Depo. 27:16-20 (Q: "So, did you receive any discipline based on this picture? Were . . . you reprimanded? Yes?" A: "A verbal reprimand" Q: "By whom?" A: "Mr. Kaboli."). Guisbert contends that Whittaker is less than 40 years old. First Am. Compl. ¶ 30, ECF No. 8.

    ii.    <u>Retaliation Claims</u>

Guisbert claims that after Events DC realigned his and other older workers' job titles, he began to criticize Events DC's mistreatment of older workers. First Am., Compl. ¶¶ 21-28, ECF

No. 8. He alleges that newer, younger workers who lacked the same certifications that he and other older workers had were hired and paid more. *Id.* ¶ 23. Guisbert claims that he first spoke to Sidberry and Tarpley about "mistreatment of and efforts to push out older workers, . . . [who] were being fired or forced to quit" in June and July of 2018. *Id.* ¶ 25-6. Guisbert also claims that he voiced these same concerns at a July 2018 meeting that Bullock, Kaboli, and Oratokhai attended, *id.* ¶ 27, and that he spoke to Mohammed about the same concerns in early 2018 and August 2018. *Id.* ¶ 24.

Events DC disputes that Guisbert spoke to Bullock, Kaboli, Mohammed, or Oratokhai, and offers their sworn testimony to the same. Def.'s MSJ at 10-11 & n.4, ECF No. 29. Events DC notes that it would be impossible for any of those individuals to have attended the July meeting, because that meeting was a union ratification meeting. *Id.* at 10 n. 4. They contend that because ratification meetings are closed to anyone other than represented staff and union officials, Bullock, Kaboli, and Oratokhai could not have been present. *Id.* at 10. It is not clear from Events DC's papers whether Mohammed was present at the meeting, though he states that Guisbert never spoke to him about the way older workers were treated. *Id.*

**B. Statutory Framework**

The Age Discrimination in Employment Act ("ADEA") prohibits employers from firing employees older than 40 based on their age. 29 U.S.C. §§ 623(a)(1), 631(a). It also prohibits an employer from retaliating against an employee who either participates in an investigation or complains of unlawful age-related employment practices. *Id.* § 623(d). Title VII of the Civil Rights Act ("Title VII") similarly prohibits termination based solely on an employee's race. 42 U.S.C. § 2000e-2(a)(1). Its anti-retaliation clause is functionally identical to the ADEA's and bars retaliation against an employee who opposes unlawful discrimination. *Id.* § 2000e-3(a). The District of Columbia Human Rights Act ("DCHRA") also makes age and racial

discrimination unlawful, though its age discrimination provisos carry no age minimum. D.C. Code § 2-1402.11(a)(1)(A). The DCHRA also prohibits retaliation against persons who complain of civil rights violations. *Id.* § 2-1402.61.

On April 10, 2019, Guisbert filed a discrimination charge with the U.S. Equal Employment Opportunity Commission ("EEOC"), checking the boxes next to age, race, and retaliation. First Am. Compl, Ex. A, EEOC Charge. After receiving a right to sue letter, Guisbert filed this lawsuit on September 20, 2019, asserting six counts:

- Count 1: Age discrimination in violation of the ADEA;
- Count 2: Racial discrimination in violation of Title VII;
- Count 3: Age discrimination in violation of the DCHRA;
- Count 4: Racial discrimination in violation of the DCHRA;
- Count 5: Retaliation in violation of the ADEA; and
- Count 6: Retaliation in violation of the DCHRA.

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine dispute of any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When determining if a genuine issue of material facts exists, the court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the "'pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits. . .' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)). The nonmoving party, in response, must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 323 (quoting Fed. R. Civ. P. 56(e). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

### III.   ANALYSIS

The three statues Guisbert invokes—the ADEA, DCHRA, and Title VII—rely on the same analysis to evaluate discrimination and retaliation claims when a plaintiff relies solely on indirect, circumstantial evidence to prove their allegations. *See, e.g.*, *Burley v. Nat'l Pass. Rail. Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015) (because the analysis for Title VII and DCHRA claims "is the same . . . [those] claims thus rise and fall together."); *Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014) (courts "apply the same approach in ADEA cases . . . [as] in Title VII cases."); *see also DeJesus v. WP Company, LLC*, 841 F.3d 527, 532 (D.C. Cir. 2016) (applying this rule). That analysis—the axiomatic *McDonnell Douglas Corp. v. Green* burden-shifting framework—requires a plaintiff to first establish a *prima facie* case of prohibited discrimination, then for an employer to come forward with a legitimate, non-discriminatory reason for the challenged employment decision. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)) (internal citations omitted).

When, as here, a plaintiff has suffered an adverse employment action and their employer has proffered a legitimate, non-discriminatory reason for the decision, the court need not "*and*

*should not*" analyze the *prima facie* case. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Instead, the court need only ask if "the evidence creates a material dispute on the ultimate issue." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016) (citing *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009)).

Thus, the court must resolve just one central question: has Guisbert produced sufficient evidence for a reasonable jury to find that Events DC's stated reason for his termination—falling asleep on the job—is pretextual, meaning that Events DC (1) discriminated against him because of age or race, and (2) retaliated against him because of his complaints about the treatment of older workers? *Burley*, 801 F.3d at 296 (quoting *Id.*). The court finds that he has.

## A.  Counts 1-4: Age and Racial Discrimination

A plaintiff may support an inference of pretext by showing that their employer treated other, similarly situated employees more favorably. *Wheeler*, 812 F.3rd at 1115 (quoting *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015)). Employees are similarly situated when they are charged with "offenses of comparable seriousness" and "all of the relevant aspects" of their employment are "nearly identical" to that of the comparator employee. *Burley*, 801 F.3d 290 at 301 (quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (internal quotation marks and citations omitted). If the court finds that an employee is not similarly situated to a comparator employee and has only produced a mere "inference of falsity or discrimination," summary judgment for the employer is appropriate. *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) (citing *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 995-996 (D.C. Cir. 2002)).

Guisbert claims that Events DC treated him less favorably than Whittaker, who was similarly situated to him, and that Events DC's policy justifying this differential treatment is mere pretext created after he was fired. Pl.'s Opp. at 8. He contends that the fact that

Whittaker—a Black employee under 40—was only disciplined while he—a White Hispanic man over 60—was fired is sufficient to create an inference of age and racial discrimination.

Events DC argues that Whittaker and Guisbert are not similarly situated. They contend that while Guisbert was directly observed sleeping by an Events DC manager, Whittaker's somnolence became known through an undated photograph taken by an elevator mechanic who was not a manager. SOF ¶¶ 21-24. Events DC argues that, based on these differences "no reasonable juror could ever conclude" that Guisbert and Whittaker were similarly situated. Def.'s Reply at 1, ECF No. 32.

Guisbert and Events DC also dispute the terms of the policy for employees caught sleeping on the job. Guisbert contends that this policy was limited to the July 19, 2017 memorandum stating "sleeping on the job . . . will be treated as grounds for disciplinary action up to and including <u>immediate</u> termination." SOF ¶ 11 (emphasis in original). Events DC claims an additional prong: that "discipline would only be assessed if a member of leadership directly observed an employee engaging in misconduct." *Id.* ¶ 12. Guisbert argues that the second prong is a pretextual policy created after he was fired.

Guisbert's argument that he is similarly situated to Whittaker turns on whether this second prong is pretextual. If it is not, and Events DC's version of the policy is correct, then Guisbert, who was allegedly caught sleeping by a member of Events DC management, would not be similarly situated to Malcom Whittaker, who was photographed sleeping on the job by a non-managerial worker employed by an outside company. Pl.'s Opp., Ex. 7, Tarpley Aff. ¶ 6-7, ECF No. 31.

Events DC's argument is problematic. To start, the second prong of its sleeping policy—upon which it rests its argument that Guisbert and Whittaker were not similarly situated—does

not appear to have been documented or promulgated in any way. The only written reference to such a policy comes from Kaboli's email justifying why he was not firing Whittaker for the photograph. SOF, Ex. 8, Kaboli Oct. 1, 2018 Email ("The picture is concerning and follow up will be needed in some form. However, . . . the discovering party is not a member of leadership or management that has identified themselves for a statement."). That email, written a few hours after Tarpley came forward with the photograph, does state that there were "several instances in which I [Kaboli] made it clear that it was not acceptable for line level staff to record one another." *Id.* Beyond this email and Kaboli's own testimony, there is no evidence in the record that the second prong of the policy existed at all.

Moreover, Kaboli took significantly different action after he was informed that Whittaker was caught sleeping than when he was informed that Guisbert was caught sleeping. After Boles sent Kaboli a memorandum accusing Guisbert of sleeping on the job on September 5, 2018, Kaboli investigated the incident by corroborating whether Guisbert was on break and discussing a course of action with Events DC's Deputy Director of Human Resources and Chief Administrative Officer. SOF ¶¶ 11, 17. Six days later, Kaboli, along with senior members of Events DC's human resources team and a union steward, met with Guisbert to discuss the allegations. SOF ¶ 19.

Kaboli promised a similar "intensive investigation" after being sent the Whittaker photograph. SOF, Ex. 8, Kaboli Oct. 1, 2018 Email. Yet his investigation seems to have gone no further than a cursory conversation with Whittaker. Pl.'s Opp., Ex. 10 27:10-14, Whittaker Dep. ("He asked me did I know about the picture. I told him yes. He asked was it before him. And I told him yes. And that pretty much—that's pretty much it.").

Events DC explains this difference by pointing to the second prong of the policy. Kaboli Dep. 98:2-13 ("[W]e don't evaluate members sleeping that weren't found by members of management."). But, as noted, that policy exists only as a one-off reference in an email from the person responsible for firing Guisbert and not Whittaker, and the policy only emerged after Guisbert had been terminated and Whittaker had not. Further, even assuming that this policy existed before the Whittaker photograph was discovered, Events DC gives no explanation for why Guisbert was subjected to an intense investigation while Whittaker was absolved with a simple conversation.

Based on the evidence presented, a reasonable jury could find that Guisbert and Whittaker were similarly situated as mechanical employees who were both observed sleeping at their post. A jury could reasonably find that the only reason that Guisbert—a White employee over 60—was fired, while Whittaker—a Black employee under 40—was not, was not because of a policy regarding who observed them, but because of age and race discrimination. And given all this, a jury could reasonably find that the policy that a member of management or leadership observe allegedly sleeping employees for an offense to be terminable was pretext for discrimination. The court will deny Events DC's motion for summary judgment on counts 1-4.

B. **Counts 5 & 6: Retaliation Claims**

Guisbert also claims that he was fired in retaliation for complaining about the treatment of older workers at Events DC. He alleges that he expressed his concerns to Manager of Engineering Najib Mohammad, Facilities Supervisors Eric Sidberry and Frances Tarpley, and at a July 2018 meeting where Bullock, Kaboli, and Oratokhai were also present. First Am. Compl. ¶¶ 25-27, 57, 62. To support these claims, Guisbert offers his own testimony, as well as that of Sidberry, his supervisor, who stated that Guisbert "often spoke . . . about his objection of the way Mr. Kaboli treated older people." Pl.'s Opp., Ex. 2 Sidberry Aff. at 1.

In response, Events DC presents testimony from Mohammed, Kaboli, Bullock, and Oratokhai stating that they had never spoken to Guisbert about this issue.  SOF ¶¶ 26-31.  As noted above, Bullock, Kaboli, and Oratokhai claim they would not have attended the July 2018 meeting because, as management employees, they were barred from attending a union ratification meeting.  Def.'s MSJ at 9-10 & n.4.  Events DC also argues the Sidberry affidavit is inadmissible hearsay, Def's Reply at 6, and urges the court to discount Guisbert's testimony as self-serving and conclusory, stopping just short of accusing Guisbert of perjury.  Def.'s Reply at 4 (quoting *Gnelga v. United States*, 2020 WL 4432117 at *3 (D.D.C. 2020) (discussing when courts may discount evidence from a plaintiff who has "deliberately committed perjury.").  This argument is unavailing.

In discrimination cases, a plaintiff's testimony, even standing alone, can make out a case of discrimination sufficient to withstand a summary judgment motion.  *See Vasser v. Shulkin*, 280 F. Supp. 3d 9, 21 n.6 (D.D.C. 2017) (citing *George v. Leavitt*, 407 F.3d 405, 414 (D.C. Cir. 2005)).  This is especially the case when a plaintiff has firsthand knowledge of a fact or event, and where the jury must resolve issues of competing testimony and witness credibility.  *Benton v. Laborers' Joint Training Fund*, 210 F. Supp. 3d 99, 117 (D.D.C. 2016) (citing *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016)).

Guisbert's testimony, by itself, would be sufficient to defeat summary judgment.  But it does not stand alone.  While Bullock, Kaboli, Mohammed, and Oratokhai all claim that Guisbert never complained about the treatment of older workers in front of them or to them, Guisbert has presented testimony from at least one corroborating source: his supervisor, Eric Sidberry.  The situation here is a classic case of disputed facts, which means summary judgment is inappropriate.

To prevail on a retaliation claim, a plaintiff must produce evidence from which a reasonable fact finder could determine that they were retaliated against because of their protected activity. *Guillen-Perez*, 415 F. Supp. 3d at 63. A plaintiff must produce to evidence that would convince a reasonable factfinder that their protected activity was not just a motivating factor, but the "but-for" cause of any adverse employment action. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) ("[T]he proper conclusion . . . is that Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); *see also Rattigan v. Holder*, 982 F. Supp. 2d 69, 80-81 (D.D.C. 2013) (applying *Nassar*).

A plaintiff may establish a causal connection "by showing that the employer had knowledge of the employee's protected activity and that the adverse personnel action took place shortly after that activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985). There is no precise timeline for what "shortly" means, so the court must "evaluate[] the specific facts of each case to determine whether inferring causation is appropriate." *Hamilton v. Geithner*, 666 F.3d 1344, 1357-58 (D.C. Cir. 2012) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)). The court should consider the whole "pattern of antagonism" that an employer allegedly engaged in, including even "later protected activity" in its temporal analysis. *Id.* The fact that a plaintiff has already demonstrated that a pretextual reason derived from the same animus is at play in their adverse employment action may be dispositive as well. *See Richardson v. Petasis*, 160 F. Supp. 3d 8, 136 (D.D.C. 2015) (quoting *Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015) (finding that a plaintiff presenting "other evidence sufficient to support an inference of pretext and retaliation . . . even more strongly supports a finding of pretext" when evaluating temporal proximity between protected activity and an adverse employment action).

Guisbert claims that he began complaining about the treatment of older workers in early 2018. First Am. Compl. ¶ 24. He recalls that these complaints continued into August 2018. He was terminated in September 2018, a month later. *Id.* ¶ 28. A one-month window is close enough in time to establish a but-for causal connection between a protected activity and termination. But Guisbert has also pointed to sufficient evidence in the record for a reasonable factfinder to conclude that his termination was already motivated by age and race-related animus. Based on that underlying animus and the temporal proximity of his protected activity and his termination, Gusibert has established that there is enough evidence for a reasonable juror to find that he was terminated for engaging in protected activity. The court will therefore deny Events DC's motion for summary judgment as to Guisbert's retaliation claims in counts 5 and 6.

### IV.   CONCLUSION

For the foregoing reasons, the court will **DENY** Events DC's motion for summary judgment, ECF No. 29. A corresponding order will accompany this opinion.

Date: March 31, 2022

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge